IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

GEORGIA TINKER                                                      PLAINTIFF


        v.                        Civil No. 05-5115


JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                     DEFENDANT


### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Georgia Tinker, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits (DIB) under the provisions of Title II and her application for Disabled Widow's Insurance Benefits. The court has before it appeal briefs submitted by the Claimant and the Commissioner (Doc. 6 and Doc. 7) and the transcript of the social security proceedings.

### Procedural Background:

Tinker filed her applications for DIB and Disabled Widow's Benefits on March 7, 2003. (Tr. 13, 52-55 ). She alleged a disability onset date of May 23, 2002, due to asthma and severe pain in her arms and shoulders. (Tr. 13, 52, 67).

Tinker's applications were denied initially and on reconsideration. (Tr. 23-24, 25-26). She requested a hearing before an Administrative Law Judge (ALJ). (Tr. 37). A hearing was held on November 9, 2004. (Tr. 319-346). Tinker appeared and testified. (Tr. 321-346). She was represented by counsel. (Tr. 321).

-1-

By written decision dated January 7, 2005, the ALJ found that the evidence showed Tinker had only a slight degree of asthma/chronic obstructive pulmonary disease (COPD), gastroesophageal reflux disease (GERD), fibromyalgia, osteoarthritis, decreased vision, and some history of other physical complaints including some left arm paraesthesias of unknown etiology. (Tr. 15). However, he found no impairment or combinations of impairments met or equaled one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 15). While there was some evidence of a non-exertional impairment, specifically a pain disorder associated with psychological factors and an adjustment disorder with depressed mood, he found these impairments to be non-severe. (Tr. 15).

The ALJ the concluded Tinker had the residual functional capacity (RFC) to perform a full range of light work. (Tr. 19-20). The ALJ concluded Tinker could not return to her past relevant work. (Tr. 19). Utilizing Rule 202.10 of the Medical-Vocational Guidelines , the ALJ concluded Tinker was not disabled within the meaning of the Social Security Act. (Tr. 20).

On February 21, 2005, Tinker requested a review on the record. (Tr. 7). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Tinker's request for review. (Tr. 3-5).

**Evidence Presented:**

At the hearing held on November 9, 2004, Tinker testified she was fifty-four years old and had completed the eighth grade. (Tr. 321). Tinker indicated she had problems with her eyes and had last had her eyes checked on October 13, 2004. (Tr. 322). She was told she needed to have cataract surgery. (Tr. 322). She needs surgery on both eyes. (Tr. 323). Because she didn't have the funds to have the surgery done, she was doing it through the Indian Clinic and Dr.

AO72A
(Rev. 8/82)

Gonzales is on staff at the Indian Center. (Tr. 323). Tinker believed the surgery was going to be scheduled for November or December. (Tr. 323).

From 1995 until May of 2002, Tinker testified she drove a dump truck for various construction companies. (Tr. 323). The trucks she drove were automatic and she was not required to do any bending, stooping, or lifting. (Tr. 324).

When she was between jobs, she worked as a waitress. (Tr. 324). As a waitress, she carried trays of food and did a lot of bending, pushing, and pulling. (Tr. 325). She also had to mop and sweep. (Tr. 325). However, there were days when she couldn't do the mopping and sweeping and other girls had to cover for her. (Tr. 325).

Over the years, Tinker also worked at a variety of other jobs. (Tr. 325). These jobs included a flagger, a sales clerk, a janitor, a cashier, a bartender and manager, and an assistant manager of a truck stop. (Tr. 325-329).

Tinker testified she lives with her boyfriend. (Tr. 333). As far as daily activities go, she testified she doesn't do "a whole lot of anything anymore." (Tr. 332). There are days when she can do her laundry if she is not hurting too much. (Tr. 339). She rests sometimes twice a day because she gets to where she feels like her legs are going to give out. (Tr. 339).

Tinker testified she doesn't do any yard work. (Tr. 339-340). She has trouble driving. (Tr. 340). In fact, for the last two weeks, Tinker testified her daughter had been driving her wherever she needed to go. (Tr. 340). Tinker testified she just can't sit in the position necessary to drive because she can't hold her hands on the steering wheel. (Tr. 340). She also indicated she can't see well enough to drive. (Tr. 340).

AO72A
(Rev. 8/82)

Some nights she sleeps six to eight hours. Some nights Tinker testified she gets no sleep at all. (Tr. 333). In a twenty-four hour period, she indicated she gets maybe eight hours sleep. (Tr. 334).

If she is able to, Tinker fixes her own meals. (Tr. 334). Usually, she just fixes a TV dinner in the microwave. (Tr. 334). She testified it had probably been a month since she had fixed a regular meal. (Tr. 334).

Tinker testified she does her own shopping. (Tr. 334). She makes a list but then forgets to take it with her. (Tr. 334). She indicated she cannot make it down every aisle in the store. (Tr. 335). Instead, she just goes and gets what she can remember she needs. (Tr. 335). If she forgets something, she calls her daughter and asks her to get it. (Tr. 335).

Tinker goes to her parents' house to see them. (Tr. 335). Tinker indicates she has difficulty making the bed. (Tr. 336).

When asked what kept her from working, Tinker testified the biggest reason is she can't move her arms and legs. (Tr. 337). She testified she can't walk for any long distances. (Tr. 337). Tinker testified her doctor had stated that fibromyalgia is really hard to treat. (Tr. 337-338).

Tinker was first diagnosed with fibromyalgia four or five years ago. (Tr. 340). The last two years is when it really starting bothering her. (Tr. 340). Tinker testified she has been on various medications off and on for depression since 1974. (Tr. 340-341).

She had been taking Vioxx but she was taken off that. (Tr. 337). She doesn't take any over-the-counter medication for pain. (Tr. 337). Tinker testified she had been told not to. (Tr.

-4-

337). She has tried heating pads, deep heats, and she takes showers to help with the pain. (Tr. 339). She testified the muscles are just so inflamed that it just doesn't help. (Tr. 339).

With her asthma, Tinker testified when the pollen and everything is high she has to use her nebulizer. (Tr. 338). Despite her doctors' recommendation that she quit smoking, Tinker testified she had been smoking since she was eighteen. (Tr. 338). She smokes "[m]aybe a pack and a half a day." (Tr. 338). Tinker testified she has been told if she keeps smoking she would have congestive heart failure. (Tr. 345). This didn't scare her. (Tr. 345).

With respect to her incontinence, Tinker testified that started about a year ago. (Tr. 341-342). Tinker indicated she had to wear Assurance and sometimes it leaks so much she has to change clothes. (Tr. 342). She never knows when that is going to happen. (Tr. 342). When she goes somewhere, Tinker testified she takes extra clothes with her. (Tr. 342). She said it might happen once a week or it might happen two days in a row. (Tr. 342).

Tinker indicated the medication hadn't worked and she had been told to try to train her kidney's. (Tr. 342). She had recently had an ultra-sound of her bladder which showed it was about twice the normal size. (Tr. 342).

Tinker testified she has pain in her shoulders, hips, feet, and every muscle in her entire body. (Tr. 343). She stated her muscles never quit hurting although there are times the pain is more severe than others. (Tr. 343). She testified that when she goes to the bathroom her legs go to sleep on her. (Tr. 343). She stated there is no position that is comfortable for her so she just changes positions. (Tr. 343). In the last week, Tinker testified the pain had been worse in her left side. (Tr. 343).

-5-

She indicates she has problems using her hands. (Tr. 344). For example, when she is doing something simple like peeling a potato she said her hands seem to lock in place. (Tr. 344).

Tinker testified she can no longer garden or work in the yard. (Tr. 344). She indicated she used to go camping and can't do that anymore because she can't walk well enough. (Tr. 344).

The vocational and medical evidence in the file indicates the following. On January 10, 2001, February 21, 2001, April 3, 2001, May 18, 2001, June 14, 2001, July 19, 2001, August 16, 2001, September 20, 2001, October 25, 2001, and November 29, 2001, Tinker was treated with chemical cautery or cyrotherapy for multiple verrucae initially on the left foot and then on both the right and left feet. (Tr. 150-151, 153, 155-158, 160-162). She was seen again on January 2, 2002, for this condition and the recommended treatment was cyrotherapy. (Tr. 149).

On May 18, 2001, Tinker was seen for a follow-up on fibromyalgia. (Tr. 269). She indicated she was having spasms daily in her legs that were worse at night. (Tr. 269). She stated her hands were sore. (Tr. 269).

On September 20, 2001, Tinker was seen complaining of right hip and right arm pain that had gotten worse over the past month. (Tr. 154). She indicated she could not hold her arms up a lot because of the pain. (Tr. 154). She was prescribed Celebrex. (Tr. 154). On October 25, 2001, Tinker was seen complaining of sinus congestion, her asthma acting up and joint pain in her hips and shoulder getting gradually worse over the past two months. (Tr. 152). She was taken off Celebrex which had proved ineffective, told to continue Singular and increase her fluids and to return as needed. (Tr. 152).

-6-

On November 29, 2001, Tinker was seen complaining of pain in her shoulders and hips upon movement of her extremities. (Tr. 263). She indicated the joint and hip pain came and went but was getting worse. (Tr. 263). On January 7, 2002, Tinker was diagnosed with sinusitis. (Tr. 148).

On February 2, 2002, Tinker was admitted to Washington Regional Medical Center. (Tr. 122-132). She complained of a 24-hour history of worsening heartburn associated with a dull sensation with radiation to her posterior left scapula as well as her arm. (Tr. 123). It was noted that her past medical history was significant for chronic obstructive pulmonary disease and gastroesophageal reflux disease. (Tr. 123).

A chest x-ray revealed no acute cardiopulmonary disease. (Tr. 125). On February 4, 2002, Tinker had a stress echocardiogram. (Tr. 118-119). The echocardiogram was negative for ischemia, chest pain, and arrhythmia. (Tr. 118-119). It showed posterior basal and posterior lateral wall mild hypokinesis. (Tr. 119). With dobutamine, the wall motion score increased to 3 to 4+ which might be secondary to valvular plain or ischemia. (Tr. 119). However, clinical correlation was required. (Tr. 119).

Tinker was seen at the W.W. Hastings Hospital Medicine Clinic on February 11, 2002. (Tr. 146). She reported that she had been seen at Washington Regional complaining of chest pain and her heart had been eliminated. (Tr. 146). She stated she still had continuous pain under her left breast and episodic pain in the upper part of her left chest. (Tr. 146). X-rays of her chest and ribs were unremarkable. (Tr. 147). She was diagnosed as suffering from chest wall pain. (Tr. 146).

AO72A
(Rev. 8/82)

On February 21, 2002, Tinker was diagnosed with multiple verrucae of the right and left feet. (Tr. 145). She was given an appointment at the podiatry clinic for March 25, 2002. (Tr. 145). She failed to keep the appointment. (Tr. 144).

On May 28, 2002, Tinker was seen complaining of a swollen eyelid and blurred vision. (Tr. 260). She was seen for Blepharitis and Charlzion (eyelid). (Tr. 260).

On July 30, 2002, Tinker had an echogram done of her abdomen at the W.W. Hastings Indian Hospital. (Tr. 138). She had been complaining of right upper quadrant abdominal pain. (Tr. 138 & 140). The test showed the liver in the upper normal limits of size, the gallbladder was unremarkable, and the pancreas was unremarkable. (Tr. 138). On January 22, 2003, Tinker was seen for sinusitis, pre-septal cellulites, and conjunctivitis. (Tr. 248-249).

On June 28, 2003, Tinker completed a supplemental interview outline. (Tr. 89-93). She indicated she could bathe, dress, shave, and take care of her own hair care needs. (Tr. 89). However, she stated there was a lot of times that she didn't do any of these things. (Tr. 89).

When asked to indicate if she could do laundry, dishes, change sheets, vacuum/sweep, iron, take out the trash, do home repairs, repair appliances, repair the car, wash the car, rake leaves, mow the yard, and do garden work, Tinker merely wrote that at times she was able to do these things. (Tr. 89). Similarly she indicated there were times she could shop for groceries or clothes, do the banking, and go to the post office. (Tr. 89).

Tinker indicated she sometimes prepared meals three times a week including making frozen dinners, meats, and vegetables. (Tr. 90). She stated it took her longer to prepare meals (about fifteen minutes) since her disability began. (Tr. 90).

AO72A
(Rev. 8/82)

At times, she could pay bills, use a checkbook, and count change. (Tr. 90). At times, she could drive including unfamiliar routes. (Tr. 90). She does not walk for exercise or errands. (Tr. 90).

She does not use any assistive devices. (Tr. 90). She stated she spent her time attending watching television, and at times visiting friends and relatives. (Tr. 90).

She indicated she had been forced to quit or been fired from three jobs because of her disability. (Tr. 90). Her disability interfered with her work because she can't walk any distance and has problems with her eyes. (Tr. 90).

She indicated she suffers from unusual fatigue and has to rest once a day for two to six hours. (Tr. 91). She also stated that she can only get out of bed for medical appointments. (Tr. 91).

Tinker indicated she had a hard time breathing and there are times she can't move her arms or use her hands. (Tr. 91). She also stated she can't stand for long periods. (Tr. 91). She stated the pain interferes with her sleep. (Tr. 91). The pain is located in her shoulders, hips, legs, feet, and chest. (Tr. 91).

She stated the pain usually lasted from thirty minutes to six to eight hours. (Tr. 91). She has the pain three to four times a week. (Tr. 91).

When asked what activities caused the pain or symptoms, Tinker responded anything physical. (Tr. 91). She stated she could stand or walk for thirty minutes and can sit for thirty minutes before the pain occurs. (Tr. 91). Continuing to stand or sit makes her symptoms worse. (Tr. 91).

AO72A
(Rev. 8/82)

Other than medication, Tinker indicated going to bed helped with her pain. (Tr. 91). Since her disability began, Tinker indicated she did nothing on an average day. (Tr. 92).

On July 3 2003, Dr. Dan Pablo removed an axillary mass and lymph node from Tinker's right breast. (Tr. 222). Pathological examination revealed no significant pathologic change of the lymph node. (Tr. 221). The soft tissue was right axillary lipoma. (Tr. 221). No further treatment was necessary. (Tr. 133).

On August 22, 2003, Tinker's eyes were examined. (Tr. 212). She was treated for chorioretinal scar, NS cataracts, cortical cataracts, and presbyopia. (Tr. 212).

On October 2, 2003, was seen by Dr. Rutter at the Wilma Mankiller Health Center. (Tr. 208). Tinker was diagnosed with COPD, fibromyalgia, right knee pain, and gastritis. (Tr. 208).

On November 24, 2003, Dr. Randy Conover performed a consultative physical examination at the request of the Administration. (Tr. 163-169). Tinker's diagnoses were: asthma; COPD; GERD, Hiatal hernia; fibromyalgia; osteoarthritis; decreased vision; history of plantar warts; right shoulder weakness; cataracts; left arm parasthesia of unknown etiology. (Tr. 169). It was noted she could handle, finger, hear and speak. (Tr. 169). However, it was noted her abilities in this regard might be hindered by her decreased visual acuity. (Tr. 169). Her ability to walk, stand, and sit were moderately limited and her ability to lift and carry were severely limited. (Tr. 169). Spirometry testing showed her lung age was 88 years. (Tr. 171). Testing indicated mild obstruction. (Tr. 171).

On December 16, 2003, Tinker was diagnosed with an exacerbation of COPD, fibromyalgia, gastritis, and a laceration to her left knee. (Tr. 202).

-10-

On January 12, 2004, Dr. Alice Davidson completed a residual physical functional capacity assessment. (Tr. 179-185). With respect to exertional limitations, it stated Tinker could occasionally lift or carry twenty pounds; could frequently lift or carry ten pounds; could stand or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and her ability to push and pull was unlimited, other than as shown for lift and/or carry. (Tr. 180). No postural, manipulative, or communicative limitations were established. (Tr. 181-182).

With respect to visual limitations, it was noted Tinker's depth perception was limited. (Tr. 182). This limitation was supported by decreased visual acuity in one eye. (Tr. 182). With respect to environmental limitations, it was noted Tinker should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (Tr. 183). These limitations were due to her asthma. (Tr. 183).

It was noted that the allegations were credible based on the impairments documented in the file. (Tr. 184). At that time, there was a treating or examining source statement regarding Tinker's physical capacities in the file. (Tr. 185). Note was made of the fact that no decrease in fingering and handling was included because of her loss of sight since her visual acuity in her good eye was normal. (Tr. 185).

On January 20, 2004, George Ootsey, a case consultant, concluded Tinker retained the residual functional capacity to perform a wide range of light work. (Tr. 94). He indicated she could not perform work requiring excellent vision and should avoid exposure to excess dust and fumes. (Tr. 94).

-11-

He indicated Tinker could not return to her past relevant work. (Tr. 94). However, he indicated she could perform jobs such as: photocopying-machine operator; collator operator; and sealing and canceling machine operator. (Tr. 94).

On February 10, 2004, Tinker was seen for sinusitis, bronchitis, and bladder incontinence. (Tr. 194). On February 24, 2004, Tinker was seen complaining of, among other things, bladder problems. (Tr. 190). She was diagnosed with incontinence of unknown etiology most likely overactive bladder. (Tr. 190). On March 9, 2004, Tinker was again seen complaining of bladder problems. (Tr. 188). She was diagnosed with suspected overflow incontinence. (Tr. 188).

On April 7, 2004, Tinker completed a second supplemental interview outline. (Tr. 101-105). She checked both yes and no when asked if she could bathe, dress and take care of her own hair care needs without assistance. (Tr. 101). She then wrote in that she could do these things but most of the time she was not able to do so. (Tr. 101).

When asked to indicate if she could laundry, dishes, change sheets and do garden work, Tinker indicated she could do these at times. (Tr. 101). She stated she could not vacuum/sweep, iron, take out the trash, do home repairs, repair appliances, repair the car, wash the car, rake leaves, and mow the yard. (Tr. 101). Tinker stated her hands, arms, and legs won't permit her to do these things anymore. (Tr. 101).

Similarly she checked both yes and no when asked if she could shop for groceries, clothing, and do the banking. (Tr. 101). She stated there were times when she managed to do these things and times when she couldn't. (Tr. 101).

-12-

Tinker indicated she prepared meals two or three times a week including making sandwiches and frozen dinners. (Tr. 102). When asked how long it took her to prepare a meal, she responded that it depended on how she was feeling and sometimes she did without. (Tr. 102).

If she can use her hands, she can pay bills, use a checkbook, and count change. (Tr. 102). At times, she can drive including unfamiliar routes. (Tr. 102). She does not walk for exercise or errands. (Tr. 102).

She does not use any assistive devices. (Tr. 102). She stated she spends her time watching television, listening to the radio, and at times visiting friends and relatives. (Tr. 102).

She indicated she had been forced to quit or been fired from one job because of her disability. (Tr. 102). Her disability interfered with her work because there are times she can't see well and she can't do anything physical. (Tr. 102).

She indicated she suffers from unusual fatigue and has to rest twice or more a day. (Tr. 103). She indicated she has pain in her shoulder and hip joints and her arms and legs go to sleep. (Tr. 103). She also stated she has muscle spasms and trouble breathing. (Tr. 103).

She stated the pain using last hours to days. (Tr. 103). She has the pain every day. (Tr. 103).

When asked what activities caused the pain or symptoms, Tinker responded everything. (Tr. 103). She stated she could stand or walk for fifteen minutes and can sit for fifteen minutes before the pain occurs. (Tr. 103). Movement makes her symptoms worse. (Tr. 103).

Other than medication, Tinker indicated nothing helped with her pain. (Tr. 103). Since her disability began, Tinker indicated she tended to be cranky and short with people. (Tr. 104).

-13-

When asked to describe what she did on an average day, she responded: "Sometimes my asthma is so bad I do good to go from the bed to bathroom. Sometimes my legs & arms hurt so bad I can't do anything." (Tr. 104). She stated it was getting worse and she had also lost bladder control. (Tr. 104).

On April 19, 2004, Tinker was seen complaining of problems with her legs and arms. (Tr. 299). She complained that it felt like they were on fire. (Tr. 299). She also complained of some numbness. (Tr. 299).

On June 21, 2004, Tinker was seen complaining of incontinence. (Tr. 291). A bladder training plan was discussed. (Tr. 291). She was prescribed Ditropan and diagnosed with mixed type urinary incontinence. (Tr. 291).

On August 24, 2004, Tinker underwent a psychological evaluation by Dr. Scott McCarty at the request of the Administration. (Tr. 276-280). Results of the Wechsler Adult Intelligence Scale, Third Edition, yielded a verbal IQ of 80, a performance IQ of 95, and a full scale IQ of 86. (Tr. 277). Dr. McCarty noted that Tinker's nonverbal skills were significantly more developed than her verbal skills. (Tr. 277).

Results on the Minnesota Multiphasic Personality Inventory–2nd Edition suggested Tinker was anxious and fearful. (Tr. 278). She tested similar to those who present with a variety of hypochondriacal complaints that are resistant to a psychological explanation. (Tr. 278). Individuals with similar profiles used repression and displacement as primary defenses and their complaints included almost any body systems but primarily included reports of chronic back pain, numbness, blurred vision, headaches, dizziness, tremors, insomnia, and general fatigue. (Tr. 278). Dr. McCarty noted that such individuals attained great secondary gains from their

-14-

chronic complaints–they demanded considerable attention from others and interventions were never enough. (Tr. 278).

On the Beck Depression Inventory and Beck Anxiety Inventory, Dr. McCarty noted Tinker scored in the moderate range for depression and anxiety. (Tr. 278). Dr. McCarty listed her diagnoses as: Axis I: Pain Disorder Associated with Psychological Factors, Adjustment Disorder with Depressed Mood, Chronic; Axis II: Histronic Features; Axis III: Deferred to a Physician; Axis IV: Health Issues, Unemployment; Axis V: GAF=55 (current). (Tr. 280). Dr. McCarty noted her overall prognosis was good with continued medication including her antidepressant medication which Tinker stated was very beneficial. (Tr. 280). He stated it appeared that Tinker's limitations in functioning were due mainly to her physical problems rather than emotional issues. (Tr. 280).

Dr. McCarty also completed a medical assessment of ability to do work-related activities (mental). (Tr. 281-282). With respect to making occupational adjustments, he noted Tinker had unlimited/very good ability to follow work rules and function independently and good ability[1] to relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, and maintain attention and concentration. (Tr. 281). With respect to making performance adjustments, he noted her ability to understand, remember and carry out simple job instructions was unlimited/very good and she had good ability to understand, remember and carry out complex job instructions and understand, remember and carry out detailed, but not complex, job instructions. (Tr. 282). With respect to making personal-social adjustments, Dr. McCarty

---

[1]Good is defined for purposes of this assessment as follows: "Good-Ability to function in this area is limited but satisfactory."

-15-

noted Tinker had good ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (Tr. 282).

On September 28, 2004, a note was made that Tinker was on the waiting list to have her cataracts removed. (Tr. 283).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results

-16-

from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

Tinker first argues the ALJ erred in assessing her RFC. Second, Tinker argues the ALJ erred in failing to place more weight on the fibromyalgia diagnosis. Third, Tinker argues the ALJ erred in assessing her credibility. Fourth, the Tinker argues the ALJ erred in using "grids" at step five.

We agree that remand is necessary in this case. First, the ALJ failed to give proper consideration to Tinker's diagnosis of fibromyalgia. Instead, he merely noted that what little

-17-

objective medical evidence there was in the record did not substantiate the degree of limitation Tinker testified to.

Fibromyalgia involves pain in fibrous tissues, muscles, tendons, ligaments and other "white" connective tissues. Diagnosis is recognized by a typical pattern of diffuse fibromyalgia and non-rheumatic symptoms, such as poor sleep, trauma, anxiety, fatigue, irritable bowel symptoms, exposure to dampness and cold, and by exclusion of contributory or underlying diseases. *See The Merck Manual,* pp. 1369-1371 (16th Edition, 1992). Its cause or causes are unknown, there is no cure, and, perhaps of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. *Forehand v. Barnhart,* 364 F.3d 984, 987 (8th Cir. 2004). The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character— multiple tender spots, more precisely eighteen fixed locations on the body (and the rule of thumb is that the patient must have at least eleven of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient who really has fibromyalgia to flinch. *See The Merck Manual,* pp. 1369-1371 (16th Edition, 1992).

We recognize that it is difficult to determine the severity of plaintiff's condition because of the unavailability of objective clinical tests. Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not. Michael Doherty & Adrian Jones, *Fibromyalgia Syndrome (ABC of Rheumatology)*, 310 BRITISH MED. J. 386 (1995). The question is whether the plaintiff is one of the minority, or not.

The medical evidence clearly indicates that plaintiff had been diagnosed with fibromyalgia. However, it appears the ALJ gave little weight to the diagnosis of fibromyalgia

-18-

or its debilitating effect. Rather, he focused his attention of plaintiff's reported ability to perform various household chores, care for her personal needs, drive, and her conservative medical treatment. (Tr. 17-19). Contrary to the ALJ's assertion, the Eighth Circuit has held, in the context of fibromyalgia cases, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity. *Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003); *See Kelley v. Callahan,* 133 F.3d 583, 588-89 (8th Cir. 1998). Accordingly, plaintiff's ability to perform these tasks does not automatically render her capable of performing work.

We also note that in describing Tinker's abilities to perform household tasks the ALJ ignored the limited ability Tinker indicated she had to engage in such tasks. At the hearing, Tinker testified she did very few household chores, had to rest twice a day, and had difficulty driving. (Tr. 332, 339-340). In supplemental interview outlines, Tinker indicated there were many times she could not take care of her own personal care needs. (Tr. 89, 101). She also stated there were times she could not do household chores. (Tr. 89, 101).

Therefore, because the ALJ improperly discredited plaintiff's subjective complaints of pain without considering the impact of her fibromyalgia, we find that his conclusion that plaintiff is not disabled is not supported by substantial evidence in the record as a whole. Accordingly, we believe remand is necessary in order to allow the ALJ to further develop the record regarding plaintiff's fibromyalgia and for a reevaluation of plaintiff's subjective complaints in light of this diagnosis. On remand the ALJ should re-evaluate plaintiff's subjective allegations in accordance with *Polaski*, 739 F.2d at 1322, specifically discussing each *Polaski* factor in the context of plaintiff's particular case.

AO72A
(Rev. 8/82)

Second, we also believe the record needs further development as to any restrictions there are on Tinker's physical or mental capabilities due to her various physical and mental conditions including pain disorder, anxiety, depression, and incontinence. On remand, the ALJ may want to obtain information from Tinker's treating physician regarding her capabilities.

Third, we believe the ALJ erred in using the Medical-Vocational Guidelines. While there are circumstances in which an ALJ may use the Guidelines even though there are non-exertional impairments, *McGeorge v. Barnhart*, 321 F.3d 766, 768-769 (8th Cir. 2003)(*quoting Thompson v. Bowen*, 850 F.2d 346, 349-350 (8th Cir. 1988)), we do not believe it was appropriate to do so in this case. "[W]hen a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." *Holley v. Massanari*, 253 F.3d 1088, 1093 (8th Cir. 2001). *See also Gray v. Apfel*, 192 F.3d 799, 802 (8th Cir. 1999). There was evidence in this case that Tinker's abilities were limited by non-exertional impairments, specifically pain disorder associated with psychological factors and an adjustment disorder with depressed mood. We therefore find the ALJ's decision is not supported by substantial evidence on the record as a whole.

<u>**Conclusion**</u>:

For the reasons stated, I recommend that the decision of the Commissioner be reversed and the case remanded. **The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact.**

-20-

**The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Dated this 12th day of June 2006.


/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)